# ATTACHMENT 3

Electronically Filed
6/28/2019 4:23 PM
Fourth Judicial District, Ada County
Phil McGrane, Clerk of the Court
By: Katee Hysell, Deputy Clerk

JAYME B. SULLIVAN
BOISE CITY ATTORNEY

SCOTT B. MUIR
Deputy City Attorney
KELLEY K. FLEMING
Deputy City Attorney
CITY OF BOISE
OFFICE OF THE CITY ATTORNEY
P.O. Box 500
Boise, ID 83701-0500
Telephone: (208) 608-7950
Idaho State Bar No. 4229 and 6560
E-mail: BoiseCityAttorney@cityofboise.org

*Attorneys for Plaintiff*

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| CITY OF BOISE CITY,<br>a municipal corporation,<br><br>Plaintiff,<br><br>v.<br><br>PERFECTMIND INC.,<br>a British Columbia corporation,<br><br>Defendant. | Case No. CV01-19-11915<br><br>**COMPLAINT** |

COMES NOW, Plaintiff City of Boise City by and through its attorneys, the Boise City Attorney's Office, and hereby complains and alleges against the Defendant PerfectMIND, Inc. as follows:

COMPLAINT - 1

## I.   PARTIES

1.      Plaintiff City of Boise City ("Boise City") is a municipal corporation in good standing and existing pursuant to the laws of the State of Idaho and located within Ada County, Idaho.

2.      Defendant PerfectMIND, Inc. ("PerfectMIND") is a British Columbia corporation doing business in Ada County, Idaho.

## II.   JURISDICTION AND VENUE

3.      This Court has jurisdiction over this complaint pursuant to Idaho Code § 5-514(a) because PerfectMIND purposefully conducted business for pecuniary benefit within the state of Idaho.  Further, PerfectMIND and Boise City expressly agreed through execution of the contract upon which causes of action herein are based that jurisdiction lays exclusively and irrevocably in the courts of the state of Idaho.

4.      Venue is proper in this Court pursuant to Idaho Code § 5-404 because PerfectMIND does not reside in Idaho and Boise City hereby designates Ada County for trial of these causes of action. In addition, the causes of action stated herein arose in Ada County, Idaho.

## III.   FACTUAL ALLEGATIONS

5.      Boise City re-alleges Paragraphs 1 through 4 herein as if set forth in full.

6.      In 2016, Boise City issued Request for Proposal 17-079 ("RFP 17-079") soliciting proposals from qualified vendors for the provision and implementation of an integrated recreation registration and facility management software solution for use by Boise City's Parks and Recreation Department and its customers.  RFP 17-079 sought a software system with a customer online and mobile interface that was capable of, among other things, managing facilities, activity registration, inventory, leagues, passes and point of sale transactions through

COMPLAINT - 2

technology that maximized effective and efficient business processes and that could integrate with other systems in use by Boise City.

     7.     On or about December 7, 2016, PerfectMIND submitted to Boise City a proposal responsive to RFP 17-079 (the "Proposal") through which it proposed its Software as a Service Platform called PerfectMIND Version 4.9.9 (the "Software"). In the Proposal, PerfectMIND represented whether it was able to meet Boise City's specific functional and technical solution requirements as follows:

       a.  PerfectMIND stated it could meet all but one of the core general solution requirements and all but one of the desirable general solution requirements and that it could do so without the need for customization;

       b.  PerfectMIND stated that it was able to meet all but thirteen of the one hundred four general information technology requirements with some customization;

       c.  PerfectMIND stated that it was able to meet all of the core and desirable security requirements without the need for customization;

       d.  PerfectMIND stated that it could meet all of the core customer interface requirements with customization and all but one of the desirable customer interface requirements without the need for customization;

       e.  PerfectMIND stated that it could meet all but three desirable GIS integration capabilities requirements with customization;

       f.  PerfectMIND stated it could meet all but one of the reporting requirements with customization;

COMPLAINT - 3

g. PerfectMIND stated it could meet all but three of the core point of sale requirements with customizations and all but two of the desirable point of sale requirements without customization;

h. PerfectMIND stated it could meet all but eight inventory management requirements with customization;

i. PerfectMIND stated it could meet all core and desirable facility management requirements without the need for customization;

j. PerfectMIND stated it could meet all core activity management requirements with customization and all but two desirable activity management requirements without customization;

k. PerfectMIND stated it could meet all but one of the core and desirable pass management requirements without the need for customization;

l. PerfectMIND stated it could meet all of the core and desirable league requirements without the need for customization;

m. PerfectMIND stated it could meet all but two core and desirable ice rink requirements with customization;

n. PerfectMIND stated it could meet all hardware requirements without the need for customization, including Verifone MX915 for transmitting payments through Verifone/Elavon;

o. PerfectMIND stated it could meet all desirable community center requirements with customization; and

p. PerfectMIND stated it could not meet any of the desirable golf requirements.

COMPLAINT - 4

8.     For many of the requirements that PerfectMIND stated it could not meet in the Proposal, PerfectMIND included statements that those requirements were either not applicable to its software solution or that it planned to be able to meet those requirements by or before the first quarter of 2018.

9.     As part of the selection process for RFP 17-079, PerfectMIND came to the City of Boise and performed a scripted demonstration for Boise City.

10.     Based upon PerfectMIND's representations to Boise City made through the Proposal and during the scripted demonstration, PerfectMIND was declared the highest ranked/best qualified proposer to RFP 17-079 and was awarded a contract thereunder.

11.     The contract Boise City and PerfectMIND entered into was a Software as a Service & Professional Services Agreement dated December 6, 2017 (the "Contract"), a true and correct copy of which is attached hereto as Exhibit A.

12.     The only amendment made to the Contract was Change Order Number 1, which was executed by Boise City and PerfectMIND on January 30, 2018. Change Order Number 1 pertains solely to the adjustment of liability insurance limits.

13.     Pursuant to the Contract, PerfectMIND became obligated to make available to Boise City the Software capable for use by Boise City to manage and operate its parks and recreation facilities, including customer relationship management, facility bookings, membership sales, point of sale transaction processing and scheduling. Further, the Contract obligated PerfectMIND to provide the professional services described in the Statement of Work contained at Exhibit B to the Contract in such a way that, upon completion of those services, the Software

COMPLAINT - 5

with the features and functionalities listed in Exhibit E to the Contract would be configured and made available to Boise City for access and use.

14.     Per the Contract, PerfectMIND's performance of professional services was to begin in January, 2018, entail completion of seven (7) milestones, and culminate in the provision of a software solution with the promised features and functionalities that Boise City could "go-live" with on December 3, 2018 (the "Implementation Period"). Each separate milestone was to be formalized by signature of the following acceptance forms: Milestone 1: Acceptance Form A, Project Kickoff; Milestone 2: Acceptance Form B, Project Initiation; Milestone 3: Acceptance Form C, Software Configuration and Reports; Milestone 4: Acceptance Form D, Data Conversion; Milestone 5: Acceptance Form E, Training; Milestone 6: Acceptance Form F, User Acceptance Testing; and Milestone 7: Acceptance Form G, Go-Live.

15.     PerfectMIND and Boise City agreed to December 3, 2018 as the contractual "go-live" date for the purpose of launching the Software during the time of year with the least amount of use by Boise City customers. Throughout the Implementation Period, Boise City personnel stressed to PerfectMIND personnel the critical nature of meeting the early-December "go-live" date so that the Software would be in use for the annual release of the Winter Activity Guide by Boise City's Parks and Recreation Department.

16.     On or about April 27, 2018, Milestone 1 was completed, as evidenced by execution of Acceptance Form A.

17.     On or about May 17, 2018, Acceptance Form B was signed but with Boise City's acceptance of completion of Milestone 2 expressly conditioned upon PerfectMIND's completion of GIS address verification functionality.

COMPLAINT - 6

18.     On or about September 28, 2018, Acceptance Form C was signed but with Boise City's acceptance of completion of Milestone 3 expressly withheld due to the list of defects provided to PerfectMIND with Acceptance Form C.

19.     PerfectMIND urged Boise City to sign off on Acceptance Forms B and C despite lack of functionality. PerfectMIND advised Boise City it would not proceed with further implementation until the Acceptance Forms were signed. The delay would result in an inability to complete implementation by the go-live date.

20.     Milestones 4 through 7 were not completed and Acceptance Forms D, E and F were not executed.

21.     On or about October 2, 2018, PerfectMIND initiated Milestone 5 training for Boise City personnel. Milestone 5 training, as described in Exhibit B of the Contract, was unable to be completed by PerfectMIND due to failure of the Software.

22.     On or about October 8, 2018, in response to integration issues between the Software and Elavon, Nima Jazbi, PerfectMIND's Director of Customer Success, stated to Boise City via e-mail that PerfectMIND does not recommend Elavon.

23.     Despite PerfectMIND's representations to the contrary, it became apparent during the Implementation Period that the Software and Verifone devices were not compatible and the City would need to purchase other credit card machines.

24.     Throughout the Implementation Period, Boise City dedicated significant resources, including supplementation of its regular personnel with temporary staffing, to assist with the development and implementation of the Software. Boise City personnel diligently conducted system and functional testing throughout the Implementation Period.

COMPLAINT - 7

25.     Boise City personnel kept PerfectMIND apprised of software feature and functionality issues throughout the Implementation Period through participation in weekly project team meetings with PerfectMIND personnel, by actively logging descriptive issues in PerfectMIND's case portal, and by other frequent e-mail and telephone communication with PerfectMIND personnel. In fact, PerfectMIND personnel commended Boise City for the helpful manner in which it documented problems with the Software functionality in the case portal.

26.     On October 30, 2018, approximately thirty-five days prior to the "go-live" date, Boise City initiated the internal escalation of dispute process with PerfectMIND pursuant to Part 10.1 of the Contract. Through this process, Boise City conveyed significant concerns with the Software first to PerfectMIND's project manager and acting account manager and then to PerfectMIND's Director of Customer Success and Chief Operating Officer.

27.     As of mid-November, 2018, less than a month prior to the "go-live" date, core business processes of the Software remained unreliable, inconsistent and/or non-operational. Significant issues existed with the general ledger, activity transfers, facility reservations, league registration, reports, scholarships, payments, passwords, permissions and roles, and the mobile interface. In addition, PerfectMIND's frequent release of updates and hotfixes to the Software constantly broke functions that had been operational prior to the release, which resulted in significant instability.

28.     During the Implementation Period, PerfectMIND addressed several issues with the Software by offering "work-arounds." The work-arounds were often labor intensive, inefficient and/or impractical. PerfectMIND advised that other issues, including some affecting

COMPLAINT - 8

critical go-live items, were to be addressed by "fixes" or by development that were not even scheduled to occur until after the "go-live" date.

29.     On November 19, 2018, Boise City sent a letter to PerfectMIND's Chief Operating Officer Ali Sanei ("COO Sanei") and Chief Executive Officer Farid Dordar ("CEO Dordar") describing several significant issues that still existed with the Software that would prevent Boise City from being able to "go live" with it in early December.

30.     In the last week of November 2018, PerfectMIND, through COO Sanei and/or Nima Jazbi, recommended to Boise City that it not "go-live" with the Software by December 5, 2018 and, instead, urged Boise City to agree to a new "go-live" date.

31.     COO Sanei responded to the November 28, 2018 Boise City letter by letter dated December 5, 2018 in which he denied either the existence or significance of the Software issues raised by Boise City and urged Boise City to "go-live" with the Software as soon as possible.

32.     As of December 5, 2018, Boise City was unable to "go-live" as the Software:

   a.  was unable to credit refunds to original payment methods, PerfectMIND scheduled this functionality for a mid-December, 2018 release but then pushed it to a tentative release date in mid-January, 2019;

   b.  was unable to allow users to add reference notes to payments, this functionality was scheduled for release in the second quarter of 2019.

   c.  contained errors in Smart Client for inventory variance import and this issue was still an open case with PerfectMIND;

   d.  digital signage was not completed as requested in that there was no way to control what was displayed;

COMPLAINT - 9

e.  check request system to pay out check for credits on account was defective as the request form was blank when generated;

f.  contained an active issue with data migration of gift cards as expiration dates were set five years from the date of import;

g.  was unable to deliver a facility schedule/calendar that fit on one page;

h.  did not deliver security deposit reporting;

i.  remained unstable, in part due to the effects of implementation of the time change to Mountain time, the allowance of creation of duplicate accounts and access to accounts without a password, and functionality breaks caused by updates and donation links issues;

j.  was unable to provide half price golf price configuration, rather, half price golf passes had to be processed as two separate transactions;

k.  was unable to split activity fees to multiple GL accounts by dollar amount;

l.  was unable to adequately deliver new user account creation and security in that the Software could not confirm email addresses prior to full account usage - when a new customer created an account no validation was performed during account creation, multiple people could sign up as a customer thus creating multiple accounts using the same e-mail address, and duplicate accounts could be created without notification or system prompt;

m.  facility time blocks did not function properly;

n.  continued to require ineffective or labor intensive "work-arounds" that would require additional Boise City staff, including the work-around offered for

amendment of a facility booking that required cancelation and re-creation of the booking, and rolling of activities to a new season;

o. did not allow customers to enter their preferred dollar amount for online donations;

p. was unable to process a check payment for over the amount owed for a transaction;

q. did not allow participant activity transfers;

r. did not permit league registration updates;

s. did not allow amendment of facility reservations;

t. contained finance/accounting inaccuracies, for example, the general ledger did not consistently balance, refunds involving checks created inaccuracies, and general ledger transactions were not correct for sale of inventory products;

u. processed point of sale transactions in a time consuming and/or erroneous way, for example, multiple past due items could not be paid in a single transaction, subsidies were being allowed to be re-used for payment, and subsidies were being allowed to pay an entire transaction rather than the required percentage payment;

v. reports did not meet requirements, including but not limited to no solutions for facility schedule/calendar and security deposit, check refund reports sent to accounting were blank and contained no refund details, the general ledger did not give beginning and ending balances, the tax receipt report was not

COMPLAINT - 11

accurate, and the balance on client profile differed from the run statement reports; and

w. contained unresolved mobile interface issues that would make for an unacceptable customer experience, for example, the Mobile MyProfile page could not fit onto a mobile screen, Add Family Member did not respect viewport, the screen was inconsistent and difficult to navigate, registration fees were not displayed in the view, and account creation notification did not happen until six minutes after account creation.

33.     On December 14, 2018, Boise City sent COO Sanei and CEO Dordar a formal notice that PerfectMIND was in breach of its obligations under the Contract ("Notice of Breach"). The Notice of Breach contained by appendix detailed examples of the Software's missing functionality. Per the Contract, the Notice of Breach began a 30-day cure period. The 30-day cure period ended on or about January 12, 2019 with no action or communication from PerfectMIND during that period in response to the Notice of Breach.

34.     On January 13, 2019, COO Sanei responded to Boise City's Notice of Breach by emailing Boise City a letter dated January 11, 2018 through which PerfectMIND denied breach of the Contract.

35.     On January 16, 2019, via letter to PerfectMIND COO Sanei and CEO Dordar, Boise City terminated the Contract for cause because PerfectMIND failed to provide a stable recreational software solution with the features and functionalities promised in both the Proposal and the Contract by the "go-live" date and despite a year-long Implementation Period.

COMPLAINT - 12

36.     Boise City met all of its non-monetary obligations under the Contract and, prior to PerfectMIND's performance breach, Boise City met all of its monetary obligations under the Contract.

37.     During the course of the Contract, Boise City made progress payments and travel costs to PerfectMIND totaling at least $116,158.37.

38.     Boise City was forced to devote full-time staff as well as temporary personnel over the course of the Implementation Period in an effort to make the Software functional at a cost to Boise City of at least $540,233.69.

39.     Despite PerfectMIND's representation in the Proposal that Verifone devices could be used, Verifone machines do not work with the Software, making it necessary for Boise City to purchase other credit card devices with attendant software amounting to $24,702.31.

40.     As a result of PerfectMIND's failure to provide deliverables and functionality as specified in the Contract, Boise City has not been able to "go-live" with the Software and has had to seek a replacement contractor to provide the needed software solution.  Boise City has thus received no value or benefit in exchange for the monies it paid to PerfectMIND and PerfectMIND has not refunded any of the payments made by Boise City.

### IV.     FIRST CAUSE OF ACTION – BREACH OF CONTRACT

41.     Boise City re-alleges and incorporates by reference Paragraphs 1 through 40 herein as if set forth in full.

42.     The Contract is a valid and enforceable written agreement between Boise City and PerfectMIND.

COMPLAINT - 13

43.    Boise City had fully performed its obligations under the Contract prior to PerfectMIND's breach of the Contract.

44.    Defendant PerfectMIND materially breached the Contract by failing to provide Boise City with a software solution consisting of the features and functionality required to be delivered by the "go live" date and after an Implementation Period of approximately one calendar year.

45.    As a result of PerfectMIND's breach of the Contract, Boise City has suffered damages in such amounts that will be proven at trial, but not less than $681,094.37 for a one year platform use fee, two milestone implementation fees, costs of professional services for integrations and customizations, PerfectMIND travel costs, Verifone Device replacement, costs for compatible equipment and software, and staff time devoted to implementation of the Software.

## V.    SECOND CAUSE OF ACTION – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

46.    Boise City re-alleges and incorporates by reference Paragraphs 1 through 45 of this Complaint as if set forth in full herein.

47.    Idaho law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of Idaho.

48.    As a result of PerfectMIND's failure to implement a software solution with the promised features and functionalities by the "go live" date and despite approximately one year of implementation services as described herein, PerfectMIND violated the implied covenant of good faith and fair dealing contained in the Contract as against Boise City.

COMPLAINT - 14

49.     As a result of PerfectMIND's breach of the implied covenant of good faith and
fair dealing, Boise City has suffered damages in such amounts that will be proven at trial, but not
less than $681,094.37 for a year-long platform use fee, two milestone implementation fees, costs
of professional services for integrations and customizations, PerfectMIND travel costs, Verifone
Device replacement, costs for compatible equipment and software, and staff time devoted to
implementation of the Software.

      VI.    **THIRD CAUSE OF ACTION - BREACH OF EXPRESS WARRANTY**

50.     Boise City re-alleges and incorporates by reference Paragraphs 1 through 49 of
this Complaint as if set forth in full herein.

51.     At Part 3.7 of the Contract, PerfectMIND warrants to Boise City that it will
provide a software solution that is compatible with Elavon payment processor.

52.     At Part 9.1 of the Contract, PerfectMIND represents and warrants to Boise City
that the Software will perform materially in accordance with the documentation therefor under
normal use and circumstances and that the Professional Services will be performed in a diligent
and workmanlike manner consistent with standards generally observed in the industry for similar
services and the Work Product will materially conform to the Statement of Work upon
acceptance, and PerfectMIND will use all commercially reasonable efforts to remedy any
material non-conformance of the Work Product to the Statement of Work in an expeditious
manner.

53.     PerfectMIND breached the express warranties contained in Parts 3.7 and 9.1 of
the Contract by failing to deliver to Boise City within the Implementation Period a software
solution that was compatible with Elavon payment processors, and which performed and/or

COMPLAINT - 15

conformed materially in accordance with the features and functionalities required by the Contract, and/or by failing to use all commercially reasonable efforts to expeditiously remedy material non-conformances with the Software.

54.     As a result of PerfectMIND's breach of the express warranties of the Contract, Boise City has suffered damages in such amounts that will be proven at trial, but not less than $681,094.37 for a one year platform use fee, two milestone implementation fees, costs of professional services for integrations and customizations, PerfectMIND travel costs, Verifone Device replacement, costs for compatible equipment and software, and staff time devoted to implementation of the Software.

## VII.    FOURTH CAUSE OF ACTION - FRAUDULENT MISREPRESENTATION

55.     Boise City re-alleges and incorporates by reference Paragraphs 1 through 54 of this Complaint as if set forth in full herein.

56.     In response to RFP 17-079, PerfectMIND falsely represented to Boise City that it could provide a recreation registration and facility management software solution that met specific functional and technical requirements.

57.     PerfectMIND's representations were material.

58.     PerfectMIND knew or should have known that its representations were false.

59.     PerfectMIND made the representations with the intent that they should be acted upon by Boise City for the purpose of obtaining Boise City's business.

60.     Boise City did not know PerfectMIND's representations were false.

61.     Boise City relied upon the truth of PerfectMIND's representations and had the right to do so.

COMPLAINT - 16

62.    As a result of PerfectMIND's fraudulent representations about the features and functionalities it could provide Boise City through the Software, Boise City has suffered damages in such amounts that will be proven at trial, but not less than $681,094.37 for a one year platform use fee, two milestone implementation fees, costs of professional services for integrations and customizations, PerfectMIND travel costs, Verifone Device replacement, costs for compatible equipment and software, and staff time devoted to implementation of the Software.

### VIII.  ATTORNEYS FEES

63.    Boise City realleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

64.    Boise City has been required to engage legal counsel to bring this Complaint and Boise City is entitled to recover costs and reasonably attorney's fees incurred in bringing this suit pursuant to the provisions of Idaho Code § 12-120 and § 12-121 and the express terms of the Contract, together with such additional rules and/or statutes as may be applicable to this matter.

### IX.    REQUEST FOR JURY TRIAL

65.    Boise City hereby demands a trial by jury as to all issues raised in this matter properly so tried, pursuant to Rule 38(b) of the Idaho Rules of Civil Procedure and Boise City will not stipulate to a jury of less than twelve persons.

### X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Boise City prays for relief against Defendant PerfectMIND as follows:

COMPLAINT - 17

1.      For an order and judgment in favor of Plaintiff Boise City and against Defendant PerfectMIND for a refund of Boise City's payments in the amount of $116,158.37;

2.      For an order and judgment against Defendant PerfectMIND in the amount of Boise City's staff time and other expenses associated with PerfectMIND's failure to provide the software as promised in the amount of $564,936.00;

3.      For an order and judgment against Defendant PerfectMIND for Boise City's damages in an amount of to be proven at trial;

4.      An award of reasonable attorney fees and costs for Plaintiff's prosecution of this action; and

5.      Such additional and other relief as the Court deems just and proper under the circumstances.

DATED this _28th_ day of June 2019.

OFFICE OF THE CITY ATTORNEY

SCOTT B. MUIR, Deputy City Attorney
Attorney for Plaintiff

COMPLAINT - 18

# EXHIBIT A

## RFP 17-079 RECREATION SOFTWARE
## SOFTWARE AS A SERVICE & PROFESSIONAL SERVICES AGREEMENT

BETWEEN

PERFECTMIND INC.

AND

CITY OF BOISE

DATED: DECEMBER 6, 2017

## TABLE OF CONTENTS

PART 1 —DEFINITIONS AND INTERPRETATION ...................................................................... 1

PART 2 —LICENSE ...................................................................................................................... 3

PART 3 —PROFESSIONAL SERVICES ....................................................................................... 4

PART 4 —FEES AND PAYMENTS ............................................................................................... 6

PART 5 —USE OF THE PLATFORM ............................................................................................ 8

PART 6 —CONTENT, INTELLECTUAL PROPERTY AND PRIVACY ........................................ 11

PART 7 —TERM AND TERMINATION ...................................................................................... 13

PART 8 —CONFIDENTIALITY ................................................................................................... 15

PART 9 —WARRANTIES, DISCLAIMERS, INDEMNITIES AND LIABILITY ........................... 16

PART 10 —GENERAL ................................................................................................................ 18

Exhibits:
    Exhibit A – Platform Use Fees
    Exhibit B – Statement of Work
    Exhibit C – PerfectMIND Rates for Professional Services
    Exhibit D – Service Levels
    Exhibit E – Platform Features and Functionalities

## SOFTWARE AS A SERVICE & PROFESSIONAL SERVICES AGREEMENT

**THIS AGREEMENT** is dated DECEMBER 6, 2017                    .

### BY AND BETWEEN:

| | | |
|---|---|---|
| **PerfectMIND Inc.** | **AND** | **City of Boise** |
| ("**PerfectMIND**"), a British Columbia corporation having an office at: | | ("**Customer**"), a municipal corporation having an office at: |
| 2nd Floor, 4333 Still Creek Drive Burnaby, British Columbia V5C 6S6 | | 150 N Capitol Blvd. Boise, Idaho 83702 |

**WHEREAS** PerfectMIND wishes to license to Customer, and Customer wishes to use and license from PerfectMIND, the Platform (as defined herein) on the terms and conditions set out in this Agreement;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

### PART 1—DEFINITIONS AND INTERPRETATION

1.1          **Definitions.** In this Agreement, unless the context otherwise requires, capitalized terms will have the meaning assigned to them herein, including the following:

(a)    "**Account**" has the meaning set out in §5.6;

(b)    "**Account-holder**" means an individual designated by Customer to whom an Account is issued;

(c)    "**Applicable Laws**" means all applicable laws and regulations, including all applicable local, provincial, state, national and foreign laws, treaties and regulations as well as orders of courts or laws, regulations, by-laws or ordinances of applicable governmental agencies;

(d)    "**Claims**" means liabilities, actions, proceedings, claims, causes of action, demands, debts, losses, damages, charges and costs, including reasonable legal costs, any amount paid to settle any action or to satisfy a judgment and expenses of any kind and character whatsoever incurred in connection therewith;

(e)    "**Confidential Information**" has the meaning set out in §8.1;

(f)    "**Content**" means all materials and content, including designs, editorials, text, graphics, audiovisual materials, multimedia elements, photographs, videos, music, sound recordings, reports, documents, software, information, formulae, patterns, data and any other work, and

1

"**Customer Content**" is Content entered, uploaded or inputted into the Platform by or on behalf of Customer;

(g)   "**Customer Data**" means information, materials, or data, including Customer Content, entered, uploaded or inputted into the Platform by or on behalf of Customer;

(h)   "**Enhancement**" means enhancements, developments, modifications, updates, additions and improvements made to the Platform, other than New Features and Functions;

(i)   "**Force Majeure**" means circumstances beyond a party's reasonable control, including without limitation, acts of God, acts of government, flood, fire, earthquakes, civil unrest, acts of terror, strikes or other labour problems, or Internet service provider failures or delays, or hosting service provider failures or delays;

(j)   "**Intellectual Property Rights**" means any and all (i) proprietary rights provided under patent law, copyright law, trade-mark law, design patent or industrial design law, semi-conductor chip or mask work law, or any other applicable statutory provision or otherwise arising at law or in equity, including, without limitation, trade secret law, that may provide a right in works, software, source code, object code, marks, ideas, formulae, algorithms, concepts, methodologies, techniques, inventions, or know-how, or the expression or use thereof, (ii) applications, registrations, licenses, sublicenses, agreements, or any other evidence of a right in any of the foregoing, and (iii) past, present, and future causes of action, rights of recovery, and claims for damage, accounting for profits, royalties, or other relief relating, referring, or pertaining to any of the foregoing;

(k)   "**New Features and Functions**" means any update, revision, new version, new module or upgrade of the Platform made available by PerfectMIND from time to time (i) that adds new functions or features to the Platform and (ii) for which PerfectMIND charges a fee to its customers in order to obtain same;

(l)   "**PerfectMIND Privacy Policy**" means PerfectMIND's privacy policy made available at http://www.perfectmind.com/academy/privacy as amended from time to time;

(m)   "**PerfectMIND Technology**" means (i) any concepts, inventions, systems, processes, techniques, methodologies, know-how, data, tools, templates, technology (including software in executable code and source code), documentation or any other information, data or materials, and any expressions of the foregoing, developed by, owned by, or licensed to, PerfectMIND; and (ii) the Work Product;

(n)   "**Permitted Purpose**" means managing and operating Customer's facilities located in the City of Boise, Idaho including customer relationship management, facility bookings, membership sales, point of sale transaction processing and scheduling;

(o)   "**Platform**" means the software and supporting hardware platform known as "PerfectMIND" that is owned and operated by PerfectMIND, and that will be made available to Customer as a service under this Agreement via a designated website or websites as may be designated by PerfectMIND, from time to time, together with the related documentation, Content (other than Customer Content and Customer Data) and end user materials delivered therewith;

(p)   "**Professional Services**" has the meaning set out in §3.1;

(q)   "**Statement of Work**" has the meaning set out in §3.1;

(r)   "**Term**" has the meaning set out in §7.1; and

(s)   "**Work Product**" means all improvements, enhancements and derivatives thereto developed by PerfectMIND for the purposes of providing the Professional Services under this Agreement or otherwise and any and all other work products developed by PerfectMIND for the purposes of providing the Professional Services under this Agreement.

1.2          **Interpretation**. In this Agreement, unless expressly stated otherwise or the context otherwise requires, (a) headings and captions are for convenience only and will not be deemed to explain, limit or modify the provisions hereof, (b) the word "**including**", when following a general statement or term, is not to be construed as limiting the general statement or term (whether or not used in connection with phrases such as "without limitation" or "but not limited to") and the word "**or**", when connecting two or more matters, will not imply an exclusive relationship between the matters, (c) a reference to a "**person**" or "**entity**" means an individual, corporation, body corporate, firm, limited liability company, partnership, syndicate, joint venture, society, association, trust or unincorporated organization or governmental authority or trustee, executor, administrator or other legal representative, including any successor to that person, (d) a word importing the masculine gender includes the feminine and neuter, a word in the singular includes the plural, a word importing a corporate entity includes an individual, and vice versa, (e) words, phrases and acronyms not otherwise defined herein that have a meaning commonly understood and accepted by persons familiar with the Internet and computing services professionals will be interpreted and understood to have that meaning herein, and (f) in the event of any conflict or inconsistency between the terms of this Agreement and the terms of the Exhibits hereto, the terms of the Exhibits hereto will prevail to the extent necessary to resolve such conflict or inconsistency.

## PART 2—LICENSE

2.1          **License**. PerfectMIND grants to Customer a non-exclusive, non-transferable, right and limited license, only during the Term, to access and use the Platform for the Permitted Purposes only. All rights not expressly granted to Customer are reserved by PerfectMIND and, if applicable, its licensors.

2.2          **Complete Software; Enhancements**. Upon completion of the Professional Services described in the Statement of Work attached to this Agreement as Exhibit B, the Platform with the features and functionalities described in Exhibit E attached to this Agreement will be configured and made available to Customer for access and use by Account-holders. Subject to sections 7.3 (c) and (d) herein and unless expressly provided otherwise in this Agreement, including its Exhibits, Customer agrees that its entry into this Agreement is not contingent on the delivery of any future functionality or features by PerfectMIND. PerfectMIND may, from time to time and its sole discretion, update the Platform (including the underlying server software or hardware) or otherwise offer Enhancements, which Enhancements will form part of the Platform being licensed and provided hereunder without further payment by Customer. PerfectMIND will use commercially reasonable efforts to (a) ensure that such Enhancements are compatible with and

will not adversely affect or reduce the functionality, performance, availability and accessibility of the Platform, and (b) to the extent that such Enhancements do so adversely affect the Platform and Customer notifies PerfectMIND of same, restore or reinstate the Platform or parts of it causing the adverse effects to its or their status prior to the Enhancement, as soon as may be reasonable and practicable in the circumstances. Notwithstanding any Enhancements or other changes to the Platform, PerfectMIND will maintain the functionality of the Platform so it is always materially equal to or better than the functionality of the Platform as of the date that Customer first commences using the Platform.

**2.3    New Features and Functions.**  PerfectMIND may, from time to time and in its sole discretion, develop and offer New Features and Functions that will not form part of the Platform licensed hereunder and may be provided and licensed separately to Customer for an additional fee. For clarity, in no event will PerfectMIND be obligated to provide any New Features and Functions free of charge and in no event will Customer be obligated to purchase any New Features and Functions to maintain functionality of the Platform. Notwithstanding the foregoing, Customer shall be entitled to use without charge all New Features and Functions related to the Parks and Recreation Suite for the Platform that are generally available to other PerfectMIND customers in the parks and recreation field.

## PART 3—PROFESSIONAL SERVICES

**3.1    Professional Services.**  Customer may, from time to time, request PerfectMIND to provide customization and deployment services and other related professional services in relation to Customer's use of the Platform (the "**Professional Services**") and PerfectMIND may, in its discretion, agree to provide the Professional Services.  Upon agreement on the particulars of the Professional Services, including the fees payable by Customer to PerfectMIND for the Professional Services, such particulars shall be included in a statement of work (a "**Statement of Work**"), which shall be signed by PerfectMIND and Customer, and which shall form a schedule to and be incorporated into and form part of this Agreement.  To the extent that there is any inconsistency between any provision in any Statement of Work and the rest of this Agreement, the terms of such Statement of Work will prevail.  Each Statement of Work may contain, unless the parties agree otherwise, a description of the work to be conducted, the functional requirements and technical specifications applicable to the work, the work schedule and milestones, the deliverables and delivery schedule, acceptance criteria, and such other information and additional terms and conditions as the parties may mutually agree upon.  As of the date of this Agreement, PerfectMIND and Customer have agreed upon the Professional Services described in the Statement of Work attached to this Agreement as Exhibit B.

**3.2    Change Orders.**  Customer may, from time to time, request changes to the scope of the Professional Services described in a Statement of Work.  In response to any such request from Customer, PerfectMIND shall determine the feasibility of providing such changes and shall estimate the increase in the total fees payable for providing such changes to the Professional Services.  Following receipt of PerfectMIND's response to Customer's request, the parties shall negotiate an amended Statement of Work which sets out the changes to the Professional Services and the additional fees payable in respect thereof.

4

**3.3**        **Customer's Responsibilities.**   The work functions and tasks relating to the Professional Services for which Customer or a third party shall be responsible shall be described in the Statement of Work. Customer agrees to perform such work functions and tasks for which it is responsible in a timely fashion. Customer agrees to provide or make available all information reasonably requested by PerfectMIND to perform the Professional Services. PerfectMIND will not be liable for loss or damage arising from reliance on any such information.

**3.4**        **Project Teams.**  Each party will be solely responsible for staffing its project team for the performance of the Professional Services by PerfectMIND and relating work functions and tasks by Customer as described in a Statement of Work.  Each member of a project team will possess skills and knowledge appropriate to the work functions to be performed by that team member at a minimum level of those proposed, unless otherwise agreed upon. Either party may, by way of replacement or addition, make changes to the personnel assigned to its project team, provided that: (a) each replacement team member shall possess skills and knowledge at least equivalent to the project-related skills and knowledge of the team member being replaced; and (b) unless necessitated by illness, death, or termination, replacement will not impair timely and successful accomplishment of the work to be performed under this Agreement. Customer shall have the right to request in writing that PerfectMIND replace any member of its team with another team member acceptable to Customer and PerfectMIND agrees to make all reasonable efforts to accommodate such requests without additional expense to Customer, provided that Customer, in its written notice, describes in reasonable detail the basis for Customer's request for replacement. Each party shall appoint a project manager in respect of its project team.  The project managers shall be available for weekly meetings to review the progress of the Professional Services.

**3.5**        **Use of Customer's Facilities.**  For Professional Services to be performed at the Customer premises, Customer will provide all work space, facilities and support that are reasonably requested by PerfectMIND to perform such Professional Services.

**3.6**        **No Liability for Customer's Failure to Perform.**   Customer agrees and acknowledges that PerfectMIND's performance of the Professional Services will be conditional upon, and subject to, Customer's performance of its obligations hereunder, and that PerfectMIND will not be liable or responsible, in any manner or to any extent, for any failure of PerfectMIND to perform all, or any part of, the Professional Services to the extent that any such failure is caused by a failure of Customer to perform its obligations.

**3.7**        **Third Party Hardware/Software.**  Customer will be solely responsible for the evaluation, selection, installation, implementation, compatibility, use and performance of and results obtained from any hardware, systems software, utility software, security software, telecommunication equipment or software, and applications software used in connection with the Professional Services, unless (and only to the extent) otherwise expressly agreed in this Agreement.  Except as expressly provided in this Agreement, Customer and/or the third party vendors of the software packages selected for use by Customer will be responsible for the installation, acceptance and performance of the selected software packages.  Notwithstanding the foregoing, if PerfectMIND identifies any hardware, equipment or software as being compatible with the Platform, PerfectMIND warrants that such hardware, equipment or software to be compatible with the Platform.   Without restricting the generality of the foregoing, the Platform will be compatible with Elavon payment processor and Team Sideline software suite.

**3.8**       **Third Party Products.**   Where the Professional Services to be provided by PerfectMIND involve the acquisition by Customer of products of third parties, PerfectMIND will not be responsible for delays in the delivery of such products by third parties or for such product's faulty quality, defective performance, or failure to perform in accordance with published specifications or accepted standards. PerfectMIND will transfer to Customer any transferable warranties provided to PerfectMIND by third parties. PerfectMIND makes no independent representations or warranties with respect to products provided by third parties. Any third party warranties are the exclusive remedies of Customer with respect to such products.

**3.9**       **Use of Subcontractors.**   Customer acknowledges that PerfectMIND may engage agents and subcontractors to perform any of the Professional Services described in a Statement of Work. PerfectMIND shall be responsible for the fulfilment of its obligations hereunder, notwithstanding the performance of any of its obligations by its agents and subcontractors. PerfectMIND shall ensure that all applicable provisions of this Agreement (including those relating to Insurance, Indemnification, and Confidentiality) are included in all of its subcontracts.

**3.10**      **No Recruitment.**   Customer agrees that during the term of this Agreement, and for a period of one (1) year thereafter, it will not, without the prior written consent of PerfectMIND, hire, retain or engage, or make an offer in respect of same to, any employee, independent contractor or consultant of PerfectMIND.

## PART 4—FEES AND PAYMENTS

**4.1**       **Platform Use Fees.**   Unless the Term is terminated early as provided for elsewhere in this Agreement, Customer will pay all fees and charges in connection with the use of the Platform in accordance with Exhibit A, which forms an integral part hereof and is incorporated herein by reference.

**4.2**       **Platform Use Billing.**   The fees payable by Customer for use of the Platform in each twelve (12) month period is payable in advance at the beginning of such period. PerfectMIND will invoice Customer for such fees at the beginning of each 12 month period, and Customer will pay each invoice within forty-five (45) days after the date of the invoice; provided that the fee for the period covering to the end of February 2019 is payable and due in accordance with the "Fee Payment Schedule" table in Exhibit B. All amounts due by Customer hereunder will be paid, unless otherwise expressly set out herein, without any deduction, adjustment or set-off whatsoever.

**4.3**       **Taxes.**   Customer is exempt from certain taxes and will provide PerfectMIND with an appropriate certificate of exemption upon request.

**4.4**       **Late Payments.**   If PerfectMIND does not receive payment in full of an invoice within 30 days after the date of such invoice and Customer fails to make full payment within ten (10) days after written notice of the non-payment is given by PerfectMIND, Customer will be deemed to be in default. Customer will pay any and all collection costs incurred by PerfectMIND in collection of outstanding debts. In addition to any other rights granted to PerfectMIND herein and available to PerfectMIND at law or in equity, PerfectMIND reserves the right to suspend the Accounts and Customer's right to use and access to the Platform if Customer is in default with

respect to its payment obligations.  PerfectMIND reserves the right to impose a reconnection fee upon reactivation if any such suspension takes place.

**4.5**          **Professional Services Fees.**  If the Professional Services are to be provided on a fixed price basis, the Statement of Work will set out the total contract price, a payment schedule, including the fees payable in respect of each deliverable and/or milestone, as applicable.  If the Professional Services are to be provided by PerfectMIND on a time and materials basis, the rate(s) in Exhibit C attached hereto will apply.  PerfectMIND may, from time to time and upon sixty (60) days' notice to Customer, amend the rate(s) for Professional Services.   Per diem rates shall be based on a 7.5 hour day.  Once a Statement of Work is signed by the parties, the rates structure in effect at the time of the signing of the Statement of Work shall apply for the duration of the project described in the Statement of Work.  PerfectMIND's fees for Professional Services (whether fixed or based on time and materials) do not include any travel, living or any other out-of-pocket expenses incurred by PerfectMIND or its subcontractors in providing Professional Services. Customer will pay PerfectMIND a flat rate of $550 per day per PerfectMIND employee or subcontractor who provides on-site Professional Services to Customer to cover accommodation, meal, local transportation and other out-of-pocket expenses, except travel (airfare) expenses. Customer will reimburse PerfectMIND for all reasonable travel (airfare) expenses incurred by PerfectMIND's to send its employees and subcontractors to Customer's site. All such travel (airfare) expenses for which PerfectMIND seeks reimbursement will be supported by documentation in a form reasonably acceptable to the Customer.

**4.6**          **Professional Fee Billing.** PerfectMIND will invoice Customer for the Professional Services according to the payment terms specified in the Statement of Work, or if no payment term is specified in the Statement of Work, on a monthly basis, and Customer will pay each invoice within forty-five (45) days after receipt of invoice, unless the parties agree otherwise in writing. Customer agrees to pay interest at the rate set out in the Statement of Work, or if none specified at 1.5% per month, on any unpaid amounts from the date due to the date upon which the balance is discharged, such interest to accrue from day to day and be compounded on a monthly basis, unless the parties agree otherwise in writing.  The fees for the Professional Services to be performed pursuant to the Statement of Work attached hereto as Exhibit B are set out and shall be due and payable to PerfectMIND in accordance with the "Fee payment schedule" section of Exhibit B, upon Customer's receipt of PerfectMIND's invoices.

**4.7**          **Taxes and Duties Relating to Professional Fees.**  All amounts payable in respect of the Professional Services rendered by PerfectMIND to Customer under this Agreement will be exclusive of all shipping charges, insurance charges, customs duties, sales taxes, value-added taxes, and any other like charges or taxes.  Customer will be responsible for paying all such charges and taxes for which it is not exempt in connection with the provision of the Professional Services under this Agreement.

**4.8**          **Currency.** All prices in this Agreement are in United States (US) dollars.

### PART 5—USE OF THE PLATFORM

**5.1      PerfectMIND Responsibilities.** PerfectMIND will provide the Platform in accordance with the service levels set out in Exhibit D. PerfectMIND will provide to Customer, at no additional charge, the support for the Platform described in Exhibit D. PerfectMIND will comply with all Applicable Laws in the performance of this Agreement.

**5.2      Training.** PerfectMIND will provide training to Customer's staff during the implementation period as provided in Exhibit B. This training may be in the form of in-person/on-site training or remote/online training. Customer's staff will also have access to all on-line training materials made available by PerfectMIND to its customers including live and pre-recorded webinars. Customer may purchase additional training at PerfectMIND's posted standard hourly rate for professional services. For additional training purchased by Customer, Customer will reimburse PerfectMIND for all reasonable travel and other out-of-pocket expenses incurred by PerfectMIND's employees and subcontractors in providing on-site training. All such expenses for which PerfectMIND seeks reimbursement will be supported by documentation in a form reasonably acceptable to Customer.

**5.3      Customer Responsibilities.** Customer will (a) be responsible for Account-holders' compliance with all of the terms and conditions of this Agreement; (b) be solely responsible for the accuracy, quality, integrity and legality of Customer Data, including Customer Content, and of the means by which Customer Data is acquired and used, including compliance with all personal information privacy laws and regulations and ensuring that no third party Intellectual Property Rights are infringed; (c) use commercially reasonable efforts to prevent unauthorized access to or use of the Platform, and notify PerfectMIND promptly of any such unauthorized access or use; and (d) use the Platform only for Permitted Purposes and in accordance with the documentation therefor and all Applicable Laws.

**5.4      Prohibited Conduct.** Customer will not

(a)   make the Platform available to anyone, or permit anyone to access the Platform, other than Account-holders;

(b)   license, sublicense, sell, resell, publish, republish, transfer, assign, distribute, rent, lease or time-share the rights granted to Customer under this Agreement, or copy or otherwise commercially exploit the Platform or its components in any way except in accordance with the rights granted hereunder;

(c)   use the Platform in any manner or for any purpose (i) that violates this Agreement, (ii) that contravenes, facilitates the violation of, or violates any Applicable Laws; (iii) that extracts, gathers, collects, or stores personal information about individuals except in compliance with all applicable personal information privacy laws or that involves data mining, robots or similar data gathering or extraction methods on individual's personal information without their consent, or (iv) that interferes with or disrupts the integrity or performance of the Platform, PerfectMIND's systems or networks or third-party data of Content contained therein;

(d)    attempt to gain unauthorized access to the Platform or its related systems or networks;

(e)    post, upload, reproduce, distribute or otherwise transmit on the Platform (i) pyramid schemes, (ii) any material that contains a virus, cancelbot, Trojan horse, worm or other harmful, disruptive or surreptitious component, (iii) defamatory, infringing, indecent or unlawful software, materials or information, or (iv) inappropriate, profane, or obscene software, materials or information without suitable or lawfully-required access controls;

(f)    alter, modify, reverse engineer, decompile, or disassemble, translate, extract data structures from or otherwise attempt to extract the source code from the Platform or any part thereof;

(g)    create derivative works based on the Platform or works containing a substantial part of the Platform;

(h)    copy, frame or mirror any part or content of the Platform;

(i)    disable or circumvent any access control or related process or procedure established with respect to the Platform;

(j)    remove any copyright or other proprietary or Intellectual Property Rights notices or labels on or in the Platform or any part, copy or report generated therefrom or thereof;

(k)    use the Platform to scan or probe another computer system, obstruct or bypass computer identification procedures or engage in unauthorized computer or network trespass without the express permission of the owners of such computer systems;

(l)    access the Platform in order to (i) build a competitive product or service, or (ii) copy any ideas, features, functions or graphics of the Platform;

(m)    forge headers or otherwise manipulate any protocols or identifiers used in any system or protocol in such a manner to disguise the origin of any Content transmitted using the Platform;

(n)    impersonate or falsely represent an association with any person, including a PerfectMIND representative, without the prior express, written permission of such person; or

(o)    permit any of the foregoing to be done by any person, including  Customer's employees, contractors, agents, or representatives, including Account-holders.

**5.5        Commercial Electronic Messages.** All email messages that Customer sends using the Platform will comply with all applicable anti-spam laws and regulations, including those relating to commercial electronic messages. When using the Platform, Customer will represent itself and/or its organization accurately and will not impersonate any other person, whether actual or fictitious. Customer specifically agrees that (to the extent that the Platform permits it, and it is within Customer's control to do so) for all messages that Customer sends using the Platform (i)

the "from" line of the message will accurately and in a non-deceptive manner identify Customer's organization; (ii) the "subject" line of the message will not contain any deceptive or misleading content regarding the overall subject matter of the message, and (iii) the message will include the contact information of the Account-holder who sends the message or another individual within Customer's organization who may be readily contacted by the recipient, and such contact information will remain valid for at least 60 days after the message is sent. Customer will ensure that every message sent using the Platform will contain an "unsubscribe" link that allows recipient to remove himself/herself/itself from Customer contact list and specify an electronic address on the World Wide Web that can be accessed by the recipient of the message for the purpose of unsubscribing. Customer will promptly, and in any event no later than 10 days after the receipt of the request, give effect to any unsubscription requests it receives. Customer may not charge a fee, require the recipient to provide any personally identifying information beyond an email address, or make the recipient take any step other than sending a reply email or visiting a single page on an Internet website as a condition for giving effect to an unsubscribe request. Customer acknowledges that Customer will be responsible for maintaining and giving effect to the list of unsubscribe requests following termination of this Agreement.

5.6      **Account Use.** PerfectMIND will issue Accounts, or permit Customer to issue Accounts, to individuals selected by Customer as Account-holders.  Only Account-holders may access or use the Platform in an administrative capacity and each Account-holder's access to the Platform requires valid login credentials, including at least user identification and secure passwords (each an "**Account**"). For clarity and without limiting the generality of the foregoing, Accounts are generally issued to Customer's employees, agents and contactors who need accessing the Platform in an administrative capacity. The rights of an Account-holder may not be used by more than one individual, unless the Account of the Account-holder is reassigned in its entirety to another Account-holder, in which case the prior holder of the Account shall no longer have any right to access or use the Platform. Customer acknowledges and agrees that Customer:

(a)     is fully responsible for Accounts assigned by or at the request of Customer and the acts and omissions of each Account-holder, including the creation of Account credentials by any person, the maintenance, confidentiality and security of all passwords related to Accounts, and any and all activities that occur under Accounts (including persons who gain access to such Accounts, whether with or without permission), except to the extent that such activities are as result of unauthorized access to the Account information database maintained on the Platform by PerfectMIND;

(b)     will notify PerfectMIND as soon as practicable after obtaining or receiving any knowledge of (i) any unauthorized use of an Account or any password related to an Account, or (ii) any other breach of security with respect to an Account, provided that such notification will not negate Customer's liability, if any, for any unauthorized use of an Account or password until such time as PerfectMIND can be reasonably expected to take corrective measures; and

(c)     will provide true, current, accurate and complete information as prompted by the Account-creation process or as otherwise requested by PerfectMIND from time to time and to promptly update such information when any changes occur so as to keep such information held by PerfectMIND true, current, complete and accurate.

10

5.7        **Usage Limitations**.  The following provisions apply with respect to the Platform:

(a)     **General Practices and Limits**.    Customer acknowledges and agrees that PerfectMIND may establish from time to time general practices and limits concerning the use of the Platform, including: the maximum size of any Customer Data, including Customer Content, that may be stored on PerfectMIND servers (the "**Storage Limit**"); the maximum amount, speed and type of Customer Data, including Customer Content, that may be sent from or received using the Platform (the "**Usage Limit**").  Such general practices and limits may be posted on PerfectMIND's website or otherwise made available through the Platform.  Customer agrees that Customer's usage may not exceed such limits, and that it is Customer's responsibility to monitor Account usage of the Platform.  PerfectMIND covenants that the Storage Limit and the Usage Limit set for Customer will not be less than the following:

<u>Minimum Storage Limit</u>

- Storage: 80GB ($160 per month for every additional 80GB blocks of storage)

<u>Usage Limit</u>

- Accountholders: Unlimited

- Email: 75,000 emails per month ($200 per month for additional 50,000 emails

(b)     **Internet-based Software**.   The Platform depends on the Internet, including networks, cabling, equipment and facilities that are not in PerfectMIND's control; accordingly (i) any representation made by PerfectMIND regarding access performance, speeds, reliability, availability, use or consistency of the Platform, to the extent that they are dependent on the underlying Internet services, are on a "commercially reasonable efforts" basis, (ii) PerfectMIND cannot guarantee any minimum level regarding actual user performance, speed, reliability, availability, use or consistency based on factors depending on the Internet, and (iii) content, data, messages, information or materials sent over the Internet may not be completely private, and anonymity is not guaranteed.

## PART 6—CONTENT, INTELLECTUAL PROPERTY AND PRIVACY

6.1        **Reservation of Rights**.   All right, title and interest, including all Intellectual Property Rights, in and to the Platform and PerfectMIND Technology is and will at all times be fully vested in PerfectMIND or its licensors, as the case may be.

6.2        **Third-Party Content**—Content accessed or available through the Platform may be owned by third-parties other than PerfectMIND or Customer (collectively, "**Third Party Content**") and may be protected by applicable Intellectual Property Rights. During use of the Platform, Customer may enter into correspondence with, purchase goods, hardware or services from, or participate in promotions of advertisers or sponsors showing their goods or services

through the Platform. Any such activities, and any terms, conditions, warranties or representations associated with such activities are solely between the applicable third party and Customer. PerfectMIND and its licensors shall have no liability, obligation or responsibility to Customer for any such correspondence, purchases or promotions.   Customer acknowledges and agrees that Customer shall be solely responsible for obtaining necessary licenses, consent and permits from third-party providers with respect to any Third Party Content or ancillary software, hardware, or services that Customer may use in connection with its use of the Platform.

**6.3**         **Feedback.**   From time to time during the term of this Agreement, Customer and Account-holders may provide PerfectMIND with comments, suggestions, ideas and impressions of the Platform (**"Feedback"**).   Customer acknowledges and agrees that, by disclosing such Feedback to PerfectMIND, the provider thereof will be deemed to have granted to PerfectMIND a royalty-free, worldwide, transferable, sub-licensable, non-exclusive, irrevocable and perpetual license to use, modify, adapt, improve or incorporate such Feedback into the Platform.   Customer acknowledges and agrees that the right to use the Platform is good and sufficient consideration for any contributions, through the Feedback or otherwise, to the design, improvement, or functionality of the Platform and the transfer to PerfectMIND thereof.

**6.4**         **Customer Data.**   PerfectMIND does not claim ownership of, and assumes no liability or responsibility with respect to, any Customer Data, including Customer Content.   As between PerfectMIND and Customer, all right, title and interest (including Intellectual Property Rights) in and to Customer Data will at all times be fully vested in Customer, except that, by posting, uploading, inputting, providing, submitting, entering or otherwise transmitting Customer Data to PerfectMIND or any third party using the Platform, Customer agrees as follows:

(a)   Customer will have thereby granted PerfectMIND a royalty-free, non-exclusive, worldwide, fully paid-up limited license to use, copy, distribute, transmit, display, edit, delete, publish and translate such Customer Data to the extent reasonably required by PerfectMIND in connection with the functionality of the Platform and the performance of this Agreement as well as to ensure adherence to or enforce the terms of this Agreement;

(b)   Customer, and not PerfectMIND, will have sole responsibility for the accuracy, quality, integrity, legality, reliability, appropriateness and Intellectual Property Rights of all Customer Data, and PerfectMIND will not be responsible or liable for the deletion, correction, destruction, damage, loss or failure to store any Customer Data save and except for that caused by the wrongful act or breach of PerfectMIND or its agents, or subcontractors; and

(c)   Customer will have thereby confirmed, represented and warranted to PerfectMIND that Customer has all rights, titles and interests (including all Intellectual Property Rights as well as the power and authority necessary), to grant the license to such Customer Data set above in subsection 6.4(a).

6.5    **Privacy.** PerfectMIND acknowledges and agree that Customer Data may contain sensitive information, and, in connection therewith, (a) PerfectMIND will comply with all Applicable Laws relating to personal information privacy, including British Columbia *Personal Information Protection Act* and will adhere to the PerfectMIND Privacy Policy, which forms an integral part hereof and is incorporated herein by reference; (b) PerfectMIND will use industry-standard management practices, technologies and security to protect the integrity, safety and security of Customer Data in both physical and electronic form; (c) Customer acknowledges and agrees that its use of the Platform will utilize, in whole or in part, the public Internet and third party networks to transmit communications, which transmissions may be intercepted by other parties or stored, cached, routed, transmitted or received in jurisdictions outside of the jurisdiction of Customer, (d) PerfectMIND will not use Customer Data for any purpose other than to provide the functionality of the Platform to Customer and its users, to ensure adherence to or enforce the terms of this Agreement, or (only in aggregate form) for site metrics; (e) PerfectMIND reserves the right to modify the PerfectMIND Privacy Policy and its security policies in its reasonable discretion from time to time, subject to any Applicable Laws.

6.6    **Use of the Other Party's Name.** Each party may use the other party's name in its news releases, marketing and promotional materials and the like provided that such will comply with any standards set by the other party from time to time. Each party will cease to use the other party's name upon any expiration or termination of this Agreement.

## PART 7—TERM AND TERMINATION

7.1    **Term.** This Agreement commences on the date first set out above and will continue in effect until and including February 28, 2023, unless earlier terminated or renewed in accordance with the provisions of this Agreement (the "**Term**"). At the expiration of the initial five year period, the Term will be automatically renewed for successive one year periods unless a party provides written notice to the other party of the first party's intention not to renew, at least thirty days before the expiry of the then-current Term.

7.2    **Renewal Terms.** The fees payable by Customer during any such renewal term will be the same as the fee for the last year during the prior term unless PerfectMIND has given Customer written notice of a pricing change at least 90 days' before the end of such prior term, in which case the pricing change will be effective upon renewal and thereafter. PerfectMind covenants that it will not increase the fees payable by Customer for using the Platform during a renewal term over the fees payable by Customer during a prior term, by more than 4% per year, compounded annually, for each year during the prior term.

7.3    **Termination.**

(a)    **For Cause.** Either party may terminate this Agreement for cause, immediately upon written notice to the other party, if:

      (i)    the other party is in default of any of its material obligations under this Agreement and such default is not remedied within thirty (30) days of the date of receipt of written notice thereof, provided that cure period with respect to default in payment obligations is ten (10) days; or

(ii)     the other party ceases to conduct business in the normal course; the other party becomes insolvent or bankrupt; the other party makes any assignment for the benefit of creditors; proceedings are instituted by or against the other party seeking relief, reorganisation or rearrangement under any laws relating to insolvency; a receiver, liquidator or trustee is appointed in respect of any property or assets of the other party; or an order is made for the liquidation, dissolution or winding up of the other party; provided in the event of termination pursuant to this section 7.3(a)(ii), the terminating party shall give as much notice as possible but in no event shall notice be less than thirty (30) days.

(b)     **Non-Appropriation.** This Agreement shall terminate and Customer shall not be obligated to comply with any provision of this Agreement during any fiscal year covered by the Term of this Agreement unless the City of Boise appropriates funds for this Agreement in its budget for each such fiscal year. In the event of non-appropriation, this Agreement shall terminate as of September 30 of the last fiscal year for which funds were appropriated. Customer shall not be liable for any penalty or expense stemming from such non-appropriation. Customer shall notify PerfectMIND in writing of any such non-appropriation at the earliest date possible. Non-appropriation of funds shall not constitute material breach of this Agreement.

(c)     **Phase Zero.** Customer has the right, but not the obligation, to terminate this Agreement immediately upon completion of Milestone 2 - Project Initiation (Discovery Phase), which is identified as a phase of Implementation in Exhibit B, if (1) as a result of the gap analysis conducted during the Discovery Phase that platform functionality does not meet customer requirements, or, (2) it is determined that the cost of implementing all the modules, features or functionality that Customer requires exceeds by more than 5% the implementation cost for the modules, features and functionality currently contemplated and costed for under this Agreement, namely $84,500. In the event of such termination, Customer shall not be liable for payment of any fees in connection with Milestones 3 through 7 nor any other penalty or expense stemming from such termination.

**7.4     Payment on Termination.** If this Agreement is terminated by Customer due to PerfectMIND's default, then PerfectMIND will refund to Customer an amount equal to the fees actually paid by Customer for the year during which the termination occurs prorated based on the post-termination portion of the year.  Except as expressly provided in this Agreement, any termination of the Agreement will not relieve Customer of its obligation to pay the fees payable to PerfectMIND for the Term of the Agreement for the use of the Platform nor does it entitle Customer to any refund. Upon the termination of this Agreement, without prejudice to any other rights PerfectMIND may have, Customer will (a) remit all fees payable for the Professional Services and Work Products accepted by Customer prior to the date of such termination or suspension; (b) remit all fees payable for work-in-progress, on a time and materials basis, at the rate structure applicable to the Statement of Work Order; and (c) remit all such other costs of PerfectMIND, demonstrated to the reasonable satisfaction of Customer, directly related to the permanent or temporary winding down of the Professional Services, work and deliveries which are being terminated or suspended.

**7.5     Return of Customer Data.** Upon request by Customer made within 30 days after the effective date of termination or expiration of this Agreement (except in the case of PerfectMIND terminating this Agreement for cause under §7.3), PerfectMIND will make available

to Customer for download a file of the relevant Customer Data in a commercially-reasonable standard (such as comma separated value (.csv) or extendible markup language (.xml)) format along with attachments in their native format as stored by PerfectMIND. After such 30-day period, PerfectMIND will have no obligation to maintain or provide any such Customer Data and will thereafter, unless legally prohibited, delete all such Customer Data in PerfectMIND systems or otherwise in PerfectMIND's possession or under PerfectMIND's control. Within 15 days of any termination for cause of this Agreement by PerfectMIND pursuant to Section 7.3, Customer may request return of Customer Data, in which case Customer will pay to PerfectMIND any fees outstanding prior to the termination of this Agreement plus any fee that PerfectMIND requests, based on the time required to accommodate Customer's request regarding return of Customer Data, and upon receipt of such payments, PerfectMIND will make available Customer Data to Customer for download as set out above. If Customer does not make a request within the 15 day time limit or fails to make payments within five (5) days after receiving PerfectMIND's fee request, Customer's right to access or use Customer Data will immediately cease, and PerfectMIND will have no obligation to maintain or provide any Customer Data and will thereafter, unless legally prohibited, delete all such Customer Data in PerfectMIND systems or otherwise in PerfectMIND's possession or under PerfectMIND's control.

**7.6**        **Survival.**  Without limiting the applicability of other terms and conditions of this Agreement, the terms of this Agreement that, by their nature, are intended to survive any purported or actual termination or expiry of this Agreement will so survive, including Part 1, Part 3, Part 6, Part 7, Part 8, Part 9 (except for §9.1) and Part 10.


# PART 8—CONFIDENTIALITY

**8.1**        **Confidential Information.**  Neither party will, without the prior written approval of the other party, disclose or use for any purpose other than exercise of its rights or performance of its obligations under this Agreement any information, documents, know-how, trade secrets of the other party, and such other information that is not in the public domain including, in respect of the Customer Data and, in respect of the Platform (collectively, **"Confidential Information"**) that may come to its knowledge or possession by reason of exchange of information under this Agreement or entering into this Agreement.

**8.2**        **Obligation to Protect.**  Each party will protect the other's Confidential Information using the same standard of care that it would use to protect its own, similar information, but in any case no less than a reasonable standard of care for information of similar sensitivity.

**8.3**        **Title.**  All right, title and interest (including all Intellectual Property Rights) in and to each party's Confidential Information will be and remain vested in such party.

**8.4**        **Permitted Disclosures.**  Each party will not disclose Confidential Information of the other party to any person except to the first party's employees, agents and sub-contractors on a strictly "need-to-know" basis, and provided that such persons have are subject to confidentiality obligations equivalent to the obligations imposed hereunder. Notwithstanding such disclosures, each party will be fully responsible for any breaches of confidentiality caused by such persons to whom the Confidential Information is disclosed as if such breach were committed by such party.

**8.5     Exceptions.**  Neither party will have an obligation with respect to Confidential Information where such party can establish, through documentary evidence, that such information (a) was previously known to it free of any obligation to keep it confidential, (b) is or becomes publicly available other than by unauthorized disclosure, (c) is legally disclosed by third parties without restrictions of confidentiality, or (d) has been independently developed by it without reference to the other party's Confidential Information.

**8.6     Governmental Disclosures.**  Notwithstanding anything else in this Agreement, if a party is required to disclose any Confidential Information to a government body or court of law or as otherwise required by law, it may do so provided that it gives the other party sufficient advance notice as reasonable in the circumstances subject to applicable law to enable the owner of such Confidential Information the opportunity to contest the disclosure or obtain a protective order and assists the owner of such Confidential Information in contesting or protecting same. PerfectMIND acknowledges that Customer is a government entity subject to compliance with the Idaho Public Records Act and agrees that Customer's disclosure of any Confidential Information in response to a public record request required for conformance to that Act is an exception to the requirements of this Section and shall not constitute a breach of this Agreement.

## PART 9—WARRANTIES, DISCLAIMERS, INDEMNITIES AND LIABILITY

**9.1     PerfectMIND Warranties.**  PerfectMIND represents and warrants to Customer that (a) the Platform will perform materially in accordance with the documentation therefor under normal use and circumstances; (b) the Professional Services will be performed in a diligent and workmanlike manner consistent with standards generally observed in the industry for similar services, and the Work Product will materially conform to the Statement of Work upon acceptance, and PerfectMIND will use all commercially reasonable efforts to remedy any material non-conformance of the Work Product to the Statement of Work in an expeditious manner; and (c) the functionality of the Platform will not be materially decreased during the Term, subject to the other provisions of this Agreement.  For clarity, PerfectMIND will not be responsible for and the warranties provided by PerfectMIND in this §9.1 do not apply to situations where improper or inadequate installation or maintenance of software or hardware that Customer uses to access or utilize, or otherwise in connection with, the Platform or Customer Data, or failure to properly configure the Platform for use in connection with such hardware or software is the cause of a failure or malfunction.

**9.2     Mutual Warranty.**  Each party represents and warrants that it has the legal power and authority to enter into this Agreement and to fully abide by the terms and conditions hereof.

**9.3     NO OTHER WARRANTIES.**  THE PLATFORM AND THE WORK PRODUCT ARE PROVIDED ON AN "AS-IS" AND "AS-AVAILABLE" BASIS AND PERFECTMIND DOES NOT GUARANTEE THAT THE PLATFORM WILL FUNCTION ERROR-FREE OR UNINTERRUPTED. CUSTOMER ACKNOWLEDGES THAT PERFECTMIND DOES NOT CONTROL THE TRANSFER OF DATA OVER COMMUNICATIONS FACILITIES, INCLUDING THE INTERNET, AND THAT THE SERVICE PROVIDED UNDER THIS AGREEMENT MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF SUCH COMMUNICATIONS FACILITIES. PERFECTMIND IS

NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS. THERE ARE NO REPRESENTATIONS, CONDITIONS OR WARRANTIES OTHER THAN THOSE EXPRESSLY PROVIDED IN THIS AGREEMENT. THE CONDITIONS, REPRESENTATIONS AND WARRANTIES EXPRESSLY SET OUT HEREIN ARE IN LIEU OF, AND PERFECTMIND EXPRESSLY DISCLAIMS, ALL CONDITIONS, WARRANTIES AND REPRESENTATIONS, EXPRESS, IMPLIED OR STATUTORY, INCLUDING IMPLIED CONDITIONS, WARRANTIES OR REPRESENTATIONS IN RESPECT OF QUALITY, CONDUCT, PERFORMANCE, RELIABILITY, AVAILABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHETHER ARISING BY USAGE OF TRADE, BY COURSE OF DEALING, BY COURSE OF PERFORMANCE, AT LAW, IN EQUITY, BY STATUTE OR OTHERWISE HOWSOEVER, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

**9.4**       **Indemnification by PerfectMIND**. PerfectMIND will indemnify, defend and hold harmless Customer, and its officers, employees and agents (collectively, in this §9.4, the "**Indemnified Persons**"), from and against any and all Claims brought or made against, or incurred by, the Indemnified Persons, or any one of them, arising out of a claim by a third party that the Platform or the Work Product infringes the Intellectual Property Rights of a third party enforceable in Canada or the United States or arising directly out of negligent acts, errors or omissions of PerfectMIND, its servants, agents, employees, guests and business invitees and subcontractors, in the performance of services under the terms of this Agreement, or otherwise in connection with this Agreement , and not caused by or arising out of the tortious conduct of Customer or its employees.

**9.5**       **Exception to PerfectMIND Indemnity**. Notwithstanding §9.4, PerfectMIND will not be required to defend or indemnify any Indemnified Person if, and to the extent that, the Claim would not have arisen but for (a) any Indemnified Person's combination of the Platform or Work products with software, services or products not supplied by PerfectMIND, (b) any breach by an Indemnified Person of any related provision of this Agreement, or (c) any refusal by the Indemnified Person to use a comparable non-infringing version of the Platform or the Work Product offered by PerfectMIND under §9.7.

**9.6**       **Indemnification by Customer**. To the extent permitted by law, Customer will indemnify and hold harmless PerfectMIND and its officers, employees and agents (collectively, in this §9.6, the "**Indemnified Persons**"), from and against any and all Claims brought or made against, or incurred by, the Indemnified Persons, or any one of them, arising out of a claim by a third party that Customer Data, or Customer use of Customer Data (a) infringes the Intellectual Property Rights of a third party, or (b) is inappropriate, profane, defamatory, infringing, obscene or indecent or otherwise breaches any Applicable Law.

**9.7**       **Additional Infringement Obligations**. If PerfectMIND receives any knowledge of any Claim in respect of §9.4 or any circumstances in which a Claim in respect of such provision is threatened or reasonably anticipated, it will, as soon as reasonably practicable, (a) procure, at its expense, the right for Customer to use the Platform or the Work Product, as the case may be, or

such infringing part thereof; (b) replace, at its expense, the Platform or the Work Product, as the case may be, or such infringing part thereof, with material of comparable functionality that does not breach this Agreement; (c) if the removal of such infringing part of the Platform or the Work Product, as the case may be, would not be a breach of this Agreement, remove such infringing part of the Platform; or (d) terminate this Agreement and refund to Customer a *pro rata* portion of the Platform use fees prepaid by Customer for the period during which the Agreement is terminated.

**9.8      Conduct of Indemnities.** Each party acknowledges that, to the extent allowed by law, the indemnifying party will be given complete authority for the defence or settlement of Claims indemnified hereunder, on the understanding that, in all events, the indemnified party will have the right (at its own expense) to participate in such defence or compromise through counsel of its choosing.  An indemnifying party's obligations to provide an indemnity hereunder will be conditional upon (a) the indemnified party notifying the indemnifying party as soon as reasonably practicable after receiving notice of a Claim, (b) the indemnified party providing such information and assistance as reasonably requested by the indemnifying party, and (c) the indemnified party not compromising or settling the Claim without the indemnifying party's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed.

**9.9      EXCLUSION AND LIMIT OF LIABILITY.** NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER AND HOWEVER CAUSED, WHETHER ARISING UNDER CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, INCLUDING (WITHOUT LIMITATION) LOSS OF PRODUCTION, LOSS OF OR CORRUPTION TO DATA, LOSS OF PROFITS OR OF CONTRACTS, LOSS OF BUSINESS, LOSS OF MANAGEMENT OR OPERATION TIME AND LOSS OF GOODWILL OR ANTICIPATED SAVINGS, EVEN IF THE PARTY HAS BEEN NOTIFIED OF THE POSSIBILITY THEREOF OR COULD HAVE FORESEEN SUCH CLAIMS. THE ENTIRE LIABILITY OF PERFECTMIND TO CUSTOMER FOR DIRECT DAMAGES FROM ANY CAUSE WHATSOEVER, AND REGARDLESS OF THE FORM OF ACTION OR THE CAUSE OF ACTION, WHETHER IN CONTRACT OR IN TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, BREACH OF A FUNDAMENTAL TERM, FUNDAMENTAL BREACH OR OTHERWISE IN CONNECTION WITH THIS AGREEMENT WILL BE LIMITED TO $578,200 (FIVE HUNDRED SEVENTY EIGHT THOUSAND, TWO HUNDRED).

**9.10      Exclusive Remedy.** This Part 9 states PerfectMIND's sole liability to Customer, and Customer's exclusive remedy against PerfectMIND for any type of Claim described in Part 9.

## PART 10—GENERAL

**10.1      Internal Escalation of Disputes.** Any controversy, claim or dispute (**"Dispute"**) arising out of or related to this Agreement, including, without limitation, Disputes covering the performance of the parties' obligations or the interpretation of the terms and conditions of this Agreement or applicable fees or payments, shall be dealt with as follows: Each Dispute initially shall be brought for resolution before a committee consisting of two (2) representatives of each of the parties- the project manager and the Account Manager from PerfectMIND and the project manager and a person with a position equivalent to Account manager from Customer.  If the

committee is unable to resolve a Dispute within ten (10) working days, then the Dispute shall be escalated to a separate committee consisting of one (1) officer of each party – the Director of Customer Service from PerfectMIND and an officer of equivalent position from Customer. If this second committee is unable to resolve the Dispute within ten (10) working days, then the Dispute shall be escalated to another separate committee consisting of two (2) executive officers of each party – the CEO and the COO of PerfectMIND and two executive officers with equivalent positions with Customer. Members of each committee shall act reasonably and good faith and attempt to resolve the dispute amicably.

10.2    **Marketing**.  PerfectMIND may use Customer's name, with an accurate reference to Customer's use of the Platform, in PerfectMIND's marketing materials or on PerfectMIND's website, with a link to Customer's website. Notwithstanding the foregoing, PerfectMIND may use Customer's logo only with Customer's prior written consent.

10.3    **Notice**.  Any notice required or permitted to be given hereunder will be in writing and may be given by personal services, including by courier, or by email if confirmed on the same day, or in writing by registered airmail, with postage prepaid to the following:

> If to PerfectMIND:
> PerfectMIND Inc.
> 2nd Floor, 4333 Still Creek Drive
> Burnaby, BC, V5C 6S6
> email: ali.sanei@perfectmind.com or farid.dordar@perfectmind.com
>
> Attention: Farid Dordar-CEO or Ali Sanei-COO
>
> If to Customer:
> City of Boise
> 150 N Capitol Blvd
> Boise, Idaho
> 83702
>
> email: kbledsoe@cityofboie.org and dgarcia@cityofboise.org
>
> Attention: Debbie Garcia - IT and Karen Bledsoe – Parks & Recreation

Any notice given by personal delivery (including courier) will be conclusively deemed to have been given on the day of actual delivery thereof and, if given by email, on the day of transmittal thereof if given during the normal business hours of the recipient on a business day, and on the business day during which such normal business hours next occur if not given during such hours.

10.4    **Assignments**.  This Agreement may not be assigned by either party without the prior written approval of the other party, such approval not to be unreasonably withheld or delayed, but may be assigned by PerfectMIND to (i) a parent, subsidiary or affiliate; (ii) an acquirer of assets; or (iii) a successor by merger, on written notice to Customer. If PerfectMIND purports to assign or transfer this Agreement it shall first ensure that the terms and conditions of this

Agreement will be binding upon any assignee or transferee. Any purported assignment in violation of this section shall be void.

**10.5      Applicable Law.**   This Agreement will be governed by and construed in accordance with the laws of the state of Idaho and the laws of the United States applicable therein, without reference to conflict of laws principles, and any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Platform shall be subject to the exclusive jurisdiction of the courts of Idaho, United States, to which the parties hereby irrevocably attorn.

**10.6      Force Majeure.**  Neither party shall be liable for damages for any delay or failure of delivery arising out of an event of Force Majeure.

**10.7      Waivers.**  No right under this Agreement will be deemed to be waived except by notice in writing signed by the party waiving its right, and any such waiver will not prejudice its rights in respect of any subsequent breach of this Agreement by the other party.  Any failure by a party to enforce any clause of this Agreement or right contained in it, or any forbearance, delay or indulgence granted by a party to the other party, will not be construed as a waiver of the first-mentioned party's rights under this Agreement.

**10.8      No Presumption.** No presumption shall operate in favour of or against any party hereto as a result of any responsibility that any party may have had for drafting this Agreement.

**10.9      Enurement.** This Agreement will enure to the benefit of and be binding upon the parties and their successors, trustees, permitted assigns and receivers.

**10.10      Injunctive Relief.** Each party acknowledges and agrees that a breach by it of the provisions of this Agreement relating to Confidential Information, Intellectual Property Rights, or restrictive obligations may result in immediate and irreparable harm to the other party for which compensation would be an inadequate remedy.  Accordingly, each party acknowledges and agrees that the other party may seek, as a matter of right and without the necessity of establishing the inadequacy of monetary damages, injunctive or other equitable relief to prevent or remedy such conduct from any court of appropriate jurisdiction.

**10.11      Entire Agreement.**   This Agreement together with Exhibits A through E constitutes the entire Agreement between the parties and supersedes all prior representations, agreements, statements and understandings, whether verbal or in writing. In connection therewith, no terms or conditions stated in any Customer purchase order or other order or documentation will be incorporated into or form any part of this Agreement, and all such terms or conditions will be null and void, notwithstanding any provision therein.

**10.12      Amendments.** This Agreement may not be amended except by written instrument signed by an authorized representative of both parties.

**10.13      Severability.** If any term or provision of this Agreement will be found by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, the same will not affect the other terms or provisions hereof or the whole of this Agreement, but such terms or provisions will be deemed modified to the extent necessary in the court's opinion to render such terms or

provisions enforceable, and the rights and obligations of the parties will be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreements of the parties herein set forth.

**10.14     Relationship of the Parties.** The parties are independent contractors. This Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties.

**10.15     No Third-Party Beneficiaries.** There are no third-party beneficiaries to this Agreement.

**10.16     Counterparts.** This Agreement may be signed in as many counterparts as may be necessary, each of which so signed will be deemed to be an original and each copy sent by electronic transmission will be deemed to be an original, and such counterparts together will constitute one and the same instrument and notwithstanding the date or dates of execution will be deemed to bear the date as first above written.

## PART 11-INSURANCE

Work shall not commence until all insurance requirements listed below have been met and certificates have been approved by Customer.  Proof of insurance shall be provided to City of Boise, Purchasing Department, P.O. Box 500, Boise, ID. 83701, prior to the start of work.  All required insurance must be issued by companies or financial institutions that are financially rated A or better and duly licensed, admitted and authorized to do business in the State of Idaho.

**11.1     Commercial General Liability.** PerfectMIND shall maintain, and specifically agrees that it will maintain, throughout the term of this Agreement, liability insurance, in which the City of Boise shall be named an additional insured in the minimum amount as specified in the Idaho Tort Claims Act set forth in Title 6, Chapter 9 of the Idaho Code (currently, a minimum of $500,000). The limits of insurance shall not be deemed a limitation of the covenants to indemnify and save and hold harmless Customer; and if Customer becomes liable for an amount in excess of the insurance limits herein provided, PerfectMIND covenants and agrees to indemnify and save and hold harmless Customer from and for all such losses, claims, actions, or judgments for damages or liability to persons or property. PerfectMIND shall provide Customer with a Certificate of Insurance, or other proof of insurance evidencing compliance with the requirements of this paragraph. In the event the insurance minimums are changed, PerfectMIND shall immediately submit proof of compliance with the changed limits.

**11.2     Automobile.** ·PerfectMIND shall maintain automobile insurance with a limit of no less than $500,000 per occurrence for owned, non-owned and hired vehicles.  If PerfectMIND has no owned motor vehicles, then hired and non-owned motor vehicle liability coverage with limits not less than $500,000 per accident for bodily injury and property damage is required.  Where applicable, the City of Boise shall be named as an additional insured.

**11.3     Workers' Compensation.** PerfectMIND will provide Customer a certificate demonstrating its compliance with the requirements and restrictions of British Columbia's statutory workers' compensation regime.

**11.4     Technology Errors and Omissions.** PerfectMIND shall have and maintain coverage for negligent acts, errors or omissions with a liability limit of $5,000,000 per claim/annual aggregate.

**11.5     Cyber Risk.** PerfectMIND shall have and maintain the following coverages with a liability limit of $5,000,000 per event/annual aggregate: information or identity theft, liability for misuse or disclosure of third party data, liability for loss of data, outages or spread of viruses, attacks, and/or destruction or disclosure of data or electronic information.



**RFP 17-078, Recreation Software**

IN WITNESS WHEREOF, City and Vendor have executed this Agreement as of the date first
above written.


**PerfectMind**
4333 Still Creek Drive, 2nd Floor
Burnaby, B.C. Canada V5C 6S6


_____        12/11/2017
Signature                                Date

Ali Sanei


## ACKNOWLEDGEMENT


State of _____ )        Brithish Columbia, Canada
                ) ss
County of _____ )


On this _11th_ day of _December_ 20 _17_, before me personally appeared _Ali Sanei_
known to me and known by me to be the person who executed the above instrument, who, being
by me first duly sworn, did depose and say that he/she is _COO of PerfectMind Inc_
and that he/she executed the foregoing instrument on behalf of said firm for the use and purposes
stated therein.


Witness my hand and official seal

_____
(notary signature)

**Ardeshir Darabi**
Barrister & Solicitor
1495 Marine Drive
West Vancouver, BC
V7T 1B8

(SEAL)


23

PURCHASING CONTRACT NUMBER RFP 17-079

APPROVED AS TO FORM AND CONTENT:

_____   12-12-17
Department                Date

_____   12-12-17
Purchasing Agent          Date

_____   12/12/17
Legal Department          Date

_____   12/12/17
Risk Management           Date


CITY OF BOISE

APPROVED BY:

_____   12/19/17
David H. Bieter, Mayor    Date

ATTEST:

_____   12/19/17
City Clerk Lynda Lowry     Date

**CONTRACT AMOUNT:**
Not to Exceed $167,100, Year 1
Not to Exceed $82,600, Year 2
Not to Exceed $82,600, Year 3
Not to Exceed $82,600, Year 4
Not to Exceed $82,600, Year 5



24

## EXHIBIT B

### Statement of Work

#### Scope/Project Management and Planning

PerfectMIND will be responsible for planning and managing the project, using best practices generally recognized as good project management methodology, and designating a Project Manager for the project, who will be responsible for:

- Adherence to the project scope and schedule
- Management of work activities including system design and installation, system configuration, data conversion, testing and quality assurance, administrator and end-user training, and go-live support
- Coordination of resources, work sessions, and training
- Communications
- Managing project issues and issue tracking
- Status reports
- Available for status calls to provide updates
- Working with the designated Customer project manager
- Deliverable acceptance and sign-off
- PerfectMind is willing to provide the City with 3 on-site visits at no extra cost not to exceed a total of 10-days on the 3 visits combined.

The frequency and other details of status reports will be agreed upon during the discovery phase. In addition to the Project Manager, PerfectMIND will assign appropriate staff to complete the deliverables described in this Statement of Work, including at minimum: system installation, software configuration, data conversion, testing, administration and end-user training and go-live support.

#### Timeline

Customer is planning to implement the solution with the following estimated timeline. PerfectMIND is expected to recommend an overall implementation plan and timeline based on their experience with implementations of similar scope and complexity.

| December 2017 | Contract Signature |
|---|---|
| January 2018 | Project kick off |
| TBD | Project Initiation |
| TBD | Software Configuration and Reports |
| TBD | User Acceptance Testing |
| TBD | Data Conversion |
| TBD | Training and Documentation |
| December 3, 2018 | Go-live |

2

**Technical Requirements**

PerfectMIND will provide a SaaS solution, the only requirement for operating and using the proposed solution will be broadband internet connection and access to the internet via a web browser with all standard browsers being supported (recommended browsers will be communicated to Customer during the implementation phase).

**Customer Testing**

PerfectMIND will develop a test plan for Customer that covers system and functional, testing. After all of the components of the system have been completed, Customer will conduct system and functional testing. Customer will report any defects to PerfectMIND immediately for correction. If any defects are found, PerfectMIND will provide a plan to achieve acceptance or to make corrections or replacements.

**Training**

PerfectMIND will provide full training to system administrators and trainers (number of system administrator and trainers to be determined at the discretion of Customer). PerfectMIND will develop a training plan for Customer to fully prepare the system administrators to support the system.  The training plan will include:

- In-depth understanding of the system functionalities, including:
  - Security Settings
  - Workflow Development
  - Report Development
  - Software Configuration
- A review of best practices in the configuration and use of the system.
- Training sessions on different modules of the system, including:
  - Contact/Account Management
  - Store/Point of Sale Training
  - Membership Management
  - Attendance Tracking
  - Billing Management
  - Activity/Program Registration
  - Facility Rental
  - Appointments and Private Lesson scheduling
  - Marketing
  - Staff Management
  - Accounting
  - Document Template creation and configuration

- Troubleshooting

PerfectMIND will provide technical assistance to Customer's IT staff on the operation of the system. PerfectMIND will investigate and troubleshoot any technical issues with the system that Customer's IT staff report to PerfectMIND.

**Post-live Support**

PerfectMIND will provide full application support during the week of go-live. PerfectMIND's project team will be available to provide go-live and post go-live support. The resource(s) will be accessible by phone and email to the system administrators.

**Future Services**

The ability to provide the services/products in this section may be required in the future. Customer may request to add similar services or products in the future, including but not limited to:

- New features or;
- Features that were identified as Custom
- Additional Reports

and such similar services and products will be provided by PerfectMIND upon PerfectMIND and Customer negotiating and entering into Statements of Work providing for same.

**Deliverables and Service Acceptance**

Customer designee will formalize the acceptance of the service via written acceptance of the following acceptance forms:

**Acceptance Form A- Project Kickoff (Milestone 1)**

<u>Purpose</u>

The purpose of the Project Kickoff Acceptance Form is to confirm that the project kickoff has occurred and the following deliverables are completed.

<u>Deliverables</u>

- Contract signature and execution
- Planning of the project kickoff/discovery session
- Resourcing and scheduling for the discovery phase
- Preliminary review of the requirements by the project team prior to the first meeting
- Creation of sandbox/test environment
- Two hours of training to familiarize Customer's IT with the Platform
- Creation of live production environment, which includes at a minimum:
    - Setup of Customer's production environment on the cloud
    - System setups including backups and retentions
    - Database security setup
    - Setup of the monitoring tools and systems on Customer's database
    - Basic configuration of the database with Parks and Rec Modules

The work was completed on _____ and accepted by Customer.
Accepted by:

(City of _____): _____     Date: _____

Title: _____


(PerfectMIND):_____     Date: _____

Title: _____

**Acceptance Form B - Project Initiation (Milestone 2)**

<u>Purpose</u>

The purpose of the Project Initiation Acceptance Form is to confirm that the project initiation is complete.

<u>Deliverables</u>

- Discovery phase, which will inform the detailed work breakdown structure and includes:
  - Existing database system discovery
  - Business process review and gap analysis
  - Activity registration overview
  - Facility configuration overview
  - Membership management overview
  - Store and point of sale overview
  - Marketing overview
  - Accounting overview

  The Discovery phase may involve multiple meetings and communications to clarify and assist PerfectMIND in understanding the above areas further.

- Project work breakdown structure includes:
  - Tasks and durations
  - Scheduling
  - Resourcing and assignments
  - Dependencies
- Initiation of tasks listed under "Scope/Project Management and Planning" above, which includes:
  - Communications requirement
  - Project reporting requirements including the frequency and details of the status reports
  - Issue list/tracker requirements

The work was completed on _____ and accepted by Customer.

Accepted by:

(City of _____): _____     Date: _____

Title: _____


(PerfectMIND):_____     Date: _____

Title: _____

6

**Acceptance Form C – Software Configuration and Reports (Milestone 3)**

<u>Purpose</u>

The purpose of the Software Configuration and Reports Acceptance Form is to confirm that the software and reports configuration is complete.

<u>Deliverables</u>
- Application configuration and setup
- Security and roles configuration
- Setup workflows and business rules
- Set-up client specific database
- Configuration of Email functionality

The work was completed on _____ and accepted by Customer.

Accepted by:

(City of _____): _____     Date: _____

Title: _____

(PerfectMIND): _____     Date: _____

Title: _____

7

**Acceptance Form D – Data Conversion (Milestone 4)**

**Purpose**

The purpose of the Data Conversion Acceptance Form is to confirm that the data converted is complete and Accepted by Customer.

**Deliverables**

The data conversion is completed and Accepted by Customer.

**Acceptance Criteria:**

PerfectMIND has provided a detailed Data Conversion Plan that, at a minimum includes:

- Description of PerfectMIND's data conversion methodology and tools
- Identification of data sources
- Method of supplying data
- Conversion schedule, including on-site and webinar reviews and planned iterations test conversions
- Roles and responsibilities, resources required
- Testing process
- Issue reporting process
- Documentation to be used for field mapping from legacy data sources to the system's database
- Documentation to be used for data transformations from legacy data code tables to system's database code tables
- Options for treatment of exceptions
- Final data conversion timetable that includes the minimum number of data conversion iterations

The work was completed on _____ and accepted by Customer.

Accepted by:

(City of _____): _____   Date: _____

Title: _____

(PerfectMIND): _____   Date: _____

Title: _____

8

**Acceptance Form E – Training (Milestone 5)**

**Purpose**

The purpose of the Training Acceptance Form is to confirm that the training is complete.

**Deliverables**

The training plan is complete and specifies the training schedule and curriculum for the recipients of system administrator training and end-user training.

Customer will confirm the following:

- System administrators have been trained on all aspects of system configuration, individual and role-based security profiles, enterprise silo security settings and configurations, document template creation, and report queries and changes.
- System administrators are able to complete new configuration items with minimal assistance from PerfectMIND.
- End users have been trained on all aspects of the system and can complete tasks within the system.
- Training materials and online learning center access have been delivered.

The work was completed on _____ and accepted by Customer.

Accepted by:

(City of _____): _____   Date: _____

Title: _____

(PerfectMIND):_____   Date: _____

Title: _____

### Acceptance Form F – User Acceptance Testing(Milestone 6)

**Purpose**

The purpose of the User Acceptance Testing Form is to confirm that the system testing is complete and the system is functional.

**Deliverables**

The test plan including test scripts, schedule, roles and responsibilities, and definitions of passed/failed test is provided to Customer and Customer is coached through the testing phase. Customer will conduct a complete test on the system to ensure the following is tested and passed:

- System functions
- Work flows and business rules
- Reports


The work was completed on _____ and accepted by Customer.

Accepted by:

(City of _____): _____  Date: _____

Title: _____


(PerfectMIND): _____  Date: _____

Title: _____

## Fee Payment Schedule

| Schedule Target Dates | Milestones & Deliverable | Subscription | Implementation | Payment Date |
|---|---|---|---|---|
| November 2017 | **Upon signing of the agreement**<br><br>• Contract Signature and Execution | | $10,080 | |
| December 2017 | **Project Kick off (Milestone 1)**<br><br>• Planning of the project kick off/discovery session<br>• Resourcing and Scheduling for the discovery phase<br>• Preliminary review of the requirements by the project team prior to the first meeting<br>• Creation of the live production environment | $0 | $0 | Upon completion of Acceptance Form A |
| TBD | **Project Initiation (Milestone 2)**<br>• Discovery phase<br>• Project work breakdown structure<br>• Initiation of tasks listed under "Scope/Project Management and Planning" | $0 | $12,070 | Upon completion of Acceptance Form B |
| | | $5,000 | | Jan. 31, 2018 |
| | | $10,000 | | February 28, 2018 |
| | | $10,000 | | March 30, 2018 |
| | | $10,000 | | April 30, 2018 |
| | | $14,560 | | May 30,2018 |
| | | $33,040 | | June 30, 2018 |

| | | | | |
|---|---|---|---|---|
| TBD | **Software Configuration and Reports (Milestone 3)**<br>• Application configuration and setup<br>• Security and roles configuration<br>• Setup workflows and business rules<br>• Configuration and creations of the reports | $0 | $14,070 | Upon completion of Acceptance Form C |
| TBD | **Data Conversion Acceptance Testing (Milestone 4)**<br><br>• Data Conversion | $0 | $12,070 | Upon completion of Acceptance Form D |
| TBD | **Training (Milestone 5)**<br>• System administrators have been trained on all aspects of system configuration, individual and role-based security profiles, enterprise silo security settings and configurations, document template creation, and report queries and changes.<br>• System administrators are able to complete new configuration items with minimal assistance from PerfectMIND.<br>• End users have been trained on all aspects of the system and can complete tasks within the system.<br>• Training materials and online learning center access have been delivered | $0 | $14,070 | Upon completion of Acceptance Form E |

| | | | | |
|---|---|---|---|---|
| TBD | **User Acceptance Testing (Milestone 6)**<br>• System functions<br>• Work flows and business rules<br>• Reports | $0 | $12,070 | Upon completion of Acceptance Form F |
| TBD | **Go-live (Milestone 7)**<br>The system is pushed to the Production environment. | $0 | $10,070 | Upon completion of Acceptance Form G |
| **Total** | | $82,600 | $84,500 | |

The above fees do not include any travel, living or any other out-of-pocket expenses incurred by PerfectMIND in providing Professional Services. Customer will pay PerfectMIND a flat rate of $550 per day per PerfectMIND employee or subcontractor who provides on-site Professional Services to Customer to cover accommodation, meal, local transportation and other out-of-pocket expenses, except travel (airfare) expenses. Customer will reimburse PerfectMIND for all reasonable travel (airfare) expenses incurred by PerfectMIND's to send its employees and subcontractors to Customer's site. All such travel (airfare) expenses for which PerfectMIND seeks reimbursement will be supported by documentation in a form reasonably acceptable to the Customer.

**EXHIBIT C**
**PerfectMIND Rate for Professional Services**

| Optional Services | Unit Price | Description |
|---|---|---|
| Importation of Data | $150/hr | Upon termination of this Agreement, PerfectMind shall supply to Customer a basic export of the complete data in a format suitable for importation. Anything beyond will be charged at this rate. |
| Professional Services | $150/hr | Services outside the agreed to Statement of Work that requires additional resourcing to accommodate Customer's requests (other than development/programming). |
| Integration to third party software | $250/hr | Processing Integration with the Customer's preferred payment processor. |
| Training | $150/hr | Any future additional training requested outside the Statement of Work. |
| Development | $250/hr | Services outside the agreed to Statement of Work that requires additional development (programming). |

The above fees do not include any travel, living or any other out-of-pocket expenses incurred by PerfectMIND in providing Professional Services. Customer will pay PerfectMIND a flat rate of $550 per day per PerfectMIND employee or subcontractor who provides on-site Professional Services to Customer to cover accommodation, meal, local transportation and other out-of-pocket expenses, except travel (airfare) expenses. Customer will reimburse PerfectMIND for all reasonable travel (airfare) expenses incurred by PerfectMIND's to send its employees and subcontractors to Customer's site. All such travel (airfare) expenses for which PerfectMIND seeks reimbursement will be supported by documentation in a form reasonably acceptable to the Customer.

15

**EXHIBIT D**
**Service Levels**

1.  **Platform Uptime.**

The Platform will achieve a system uptime performance level of 99.9% during the Operation Hours on an annual basis inclusive of any downtime caused by the underlying telecommunication services provider. In this Exhibit, "Operation Hours" means 6 am to midnight Pacific Time, seven days a week.

PerfectMind will only be responsible for its Platform uptime performance levels and will not be responsible for any failure due to a failure of Customer's system(s) or a Force Majeure event as described in this Agreement, and such failures shall not be counted against PerfectMind's required system uptime performance levels.

PerfectMind may, upon not less than seven (7) days' prior written notice to Customer, which may be email notification, cause the Platform to be unavailable for a period of time not to exceed 12 consecutive hours ("Planned Maintenance"). Planned Maintenance will be performed during the Maintenance Window, and not more than once per week, unless any such Planned Maintenance is a result of urgent events outside of PerfectMind's direct control in which case PerfectMind will provide as much notice as is practicable. Planned Maintenance will apply against PerfectMind's required uptime performance level unless (i) it is conducted during the Maintenance Window; or (ii) it is as result of remedial work necessary to address a material defect with third party software such as Microsoft® operating system or SQL server. In this Exhibit D, "Maintenance Window" means between 12:01 am and 6:00 am Pacific Time on any day.

2.  **Technical Support.**

Following the reporting of a problem by Customer's technical support personnel either via phone call or email PerfectMind's technical support, PerfectMind will respond to the problem in accordance with the incident level and provide a fix to the problem all in accordance with the table set forth below:

| 24x7x365 Technical Support | | |
|---|---|---|
| Description | Response time | Resolution Time |
| Customer report an incident via phone, email, or chat | A live agent will immediately discuss the issue with Customer | 85% of the incidents are currently addressed on the first call |
| The initial call requires escalation to Level II | The initial call will be transferred to a Sr. live agent to further discuss the incident with the customer | 95% of the escalated calls to level II are addressed within the first call |
| The escalated call to Level II requires escalation to the Development team | Level II agent create a case for the development team to further investigate the incident | Resolution time will follow the SLA table below |

| Service Level Agreement | | |
|---|---|---|
| **Incident Level** | **Description** | **Resolution Time** |
| Critical | This incident level is attained when the following conditions are met:<br>- Complete inability to use the Platform; or<br>- A reoccurring temporary inability to use the Platform | Within the **same business day** |
| High | This incident level is attained when the following conditions are met:<br>- A significant degradation of the significant features or functions available or the Platform<br>- Recent modifications to the Platform cause some significant features or functions to operate inconsistently | Within **24 hours** |
| Low | This incident level is attained when the following conditions are met:<br>- A minor degradation of some significant features or functions; or a degradation of some secondary features or function occurs | These issues will be reviewed and prioritized according to the severity of the issue.  An accurate estimate will be provided to the customer within a week after the incident is reported |

17

EXHIBIT E

Platform Features and Functionalities

PerfectMind's Platform will include the following features and functionalities:

- **Built-In Reporting Engine**
  A built-in reporting engine to help the customer to create reports.
- **Integrated Workflow Engine**
  Generate workflows to streamline your team's processes and communications
- **Business App Store**
  PerfectMind is adaptable through our community-driven App Store.
- **Open API**
  Having access to an adaptable integration with external apps allows fluid interconnectivity and collaboration across platforms
- **Data Security, Auditing and Permissions**
  The ability to control app-level access, user auditing, user time limits, specific IP access, as well as group- and role-based data permissions.
- **Multi-Site Management & Reporting**
  To allow client to manage multiple sites from one account.
- **24/7 Customer Service**
  PerfectMind provides 24x7 operation support using live agents/chat/email.
- Integration with Elavon payment processor and Team Sideline software suite.

**Functionality to validate physical addresses based on GIS location to determine residency."**

**Recreation Management Features:**

- **Facility booking and Scheduling**
  PerfectMind booking takes care of conflict and contract management, recurring bookings, equipment and rental inventory, capacity management and more. Your staff and your members can schedule events online or on-site. PerfectMind lets you manage facility dependencies, availability, and multiple rates. Customers can book using desktop, tablet or mobile devices on all popular web browsers.
- **Membership Management**
  This allows you to manage families, multiple memberships, and related contacts.
- **Document Management**
  You can create, save, print, upload and manage your documents for your organization in the cloud. Sign waivers, contracts, and other documents electronically with a digital signature and store them safely in the cloud.
- **Staff Management**
  You can view all your staff schedules in one master calendar. PerfectMind provides your staff with the ability to make their own schedule and to adjust availability for vacations and time off. Manage staff wages, commissions, hours, availability and much more. Restrict access permissions for users and groups to improve security.
- **Activity Registration**
  Online or on-site registration for all types of bookings including courses, private lessons,

18

drop-in and flexible registrations to accommodate your needs. Intelligent conflict management gives you the flexibility to readily make changes to events.

- **POS and Inventory Management**
  To sell products, service or event online or on-site using cutting-edge features within inventory and sales management. Track purchase orders and inventory.
- **Attendance Tracking and Check-in**
  Allow customers to scan or check themselves in at the front desk using a kiosk, or manually check-in with a staff member. Improve retention with live class statistics, and much more. Guest check-ins allow for quick processing to non-members or during busy periods.
- **Calendar**
  Flexible, multi-functional calendar with drag-and-drop functionality to make changes and updates to events, activities and facility booking. You can also view multiple facilities, locations and courses.
- **Marketing**
  A built-in, fully-functional email solution replaces the need for any additional email applications so you can streamline your marketing for programs, campaigns, and personalized operation emails. Increase signups and enrollments using loyalty and referral programs. You can also have access to simple and customizable landing pages and lead-capture forms.
- **Task Management**
  To schedule automated and recurring tasks with alerts to stay up-to-date, organized and focused. Set reminders based on predefined or custom triggers
- **Reports**
  PerfectMind's built-in reporting engine enables you to create, customize and run reports. Create and schedule custom financial, attendance, utilization, and marketing reports all from the same interface. View real-time analytics and historical data in tabular or graphical format. All reports can be exported for use in a third-party application.
- **Account management**
  To keep track of your clients and contacts including organizations and families